1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   GUSTAVO COSIO,                    )   NO. EDCV 10-828 SS
                                       )
12              Plaintiff,             )
                                       )
13        v.                           )   **MEMORANDUM DECISION AND ORDER**
                                       )
14   MICHAEL J. ASTRUE,                )
     Commissioner of the Social        )
15   Security Administration,          )
                                       )
16              Defendant.             )
     ─────────────────────────────────)
17

18

19                              **I.**

20                         **INTRODUCTION**

21        Gustavo Cosio ("Plaintiff") requests this Court to overturn the

22   decision of the Commissioner of the Social Security Administration (the

23   "Commissioner") denying his application for Supplemental Security Income

24   ("SSI") benefits and disability insurance benefits ("DIB").  On June 4,

25   2010, Plaintiff filed a Request To Proceed In Forma Pauperis ("IFP

26   Request") and lodged a complaint (the "Complaint").  On August 3, 2010,

27   this Court granted Plaintiff's IFP Request and filed Plaintiff's

28   Complaint.  Pursuant to this Court's August 4, 2010 order, the

Commissioner filed an answer to Plaintiff's complaint and a certified administrative record ("AR") on December 6, 2010, and Plaintiff and the Commissioner each filed a memorandum of points and authorities ("Plaintiff's Memorandum" and the "Commissioner's Memorandum") in support of their positions on January 5, 2011 and January 31, 2011 respectively. On February 15, 2011, Plaintiff filed a reply to the Commissioner's Memorandum. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II.

## PROCEDURAL HISTORY

On February 9, 2006, Plaintiff filed an application for DIB under Title II. (AR 38). On February 15, 2006, Plaintiff filed a second application for SSI benefits under Title XVI. (AR 37). Plaintiff was born on June 29, 1967 and was thirty-eight years old at the time he filed his benefit applications. (AR 37-38). Plaintiff claimed he has been disabled since January 18, 2005. (AR 44, 83). Plaintiff was thirty-seven at the time he allegedly became disabled. (See AR 37-38, 52). The Commissioner initially denied Plaintiff's applications on June 8, 2006 and again denied Plaintiff's applications upon reconsideration on January 11, 2007. (AR 54-59, 62-66).

On February 1, 2007, the Commissioner received Plaintiff's request for an Administrative Hearing (the "Hearing") by an Administrative Law Judge ("ALJ"). (AR 71). The Hearing took place in San Bernardino,

California on December 4, 2007. (AR 11). At the Hearing, Plaintiff, represented by counsel, appeared and testified. (AR 17-30). Vocational expert ("VE") Corrine Porter also testified at the Hearing. (AR 31-35). On January 23, 2008, Plaintiff learned that the ALJ issued an unfavorable decision. (AR 10). On February 19, 2008, the Commissioner received Plaintiff's request for a review of the ALJ's decision. (AR 9). On April 7, 2010, the Commissioner denied Plaintiff's Request for Review, making the ALJ's decision final. (AR 1-3).

**III.**

**FACTUAL BACKGROUND**

**A. <u>Plaintiff's Testimony</u>**

At the December 4, 2007 Hearing, Plaintiff, represented by counsel, testified that he has not worked since January 2005 due to severe back pain. (AR 20). According to Plaintiff, he reported a problem with his back in 2000 and had since received one injection and pain medication to address his back pain. (AR 21). Plaintiff also testified that he watches television and walks outside to "use up [his] day," but he "hardly get[s] any exercise because of the pain." (AR 22). Plaintiff described difficulty while standing and sitting. (AR 23-24). Plaintiff also described difficulty while sleeping, stating that "at night, . . . [Plaintiff must sleep in a] complete almost standing position with cushions around." (AR 23). Plaintiff added that he "hardly sleep[s] at all during the night." (<u>Id.</u>).

//

//

Additionally, Plaintiff described difficulties with self-care. (AR 27). Plaintiff testified that he has difficulties bathing and dressing himself and that he required his wife's assistance to get dressed. (Id.). Plaintiff also stated that he has to lay down for about one hour three to four times during the day because he has to sleep and that he can only lift and carry "nine pounds if even that." (Id.). When the ALJ asked Plaintiff about a May 25, 2004 medical report that quoted Plaintiff as saying that he regularly plays soccer, Plaintiff stated that he did not know when he last played soccer and did not think 2004 was the last time he played. (AR 28). When asked to rate his pain on a scale of zero to ten, Plaintiff stated, "It's an intense like a nine. It's an intense pain that is inside. Like, for instance, if I try to bend out like straighten myself out, it increases the pain more." (AR 29).

## B. **Plaintiff's Medical Evidence**

Plaintiff's medical evidence begins on June 5, 2000 and continues to January 11, 2007. (AR 150-295). The Administrative Record contains medical records from Concentra Occupational Medical Center; Desert Valley Medical Group; Desert Valley Hospital; and various Kaiser Permanente locations. (AR 150-73, 189-256, 269-91). The AR also contains examinations conducted by Dr. Albert Simpkins and Dr. Warren Yu, as well as reviews of Plaintiff's medical records by Dr. Leonard Naiman and Dr. F. Kalmar. (AR 174-88, 257-68, 292-95).

//

//

//

### 1. Plaintiff's Treatment Records

On May 25, 2004, Plaintiff received treatment from Jones and Jones Medical Associates. (AR 159). The notes state that Plaintiff initially complained of a headache but later denied the headache and complained only of back pain. (Id.). Plaintiff also stated that he plays soccer regularly without difficulty. (Id.). The next day, Plaintiff had three views of his spine imaged at Valley Imaging Center. (AR 155). Dr. G.S. Kang reported that Plaintiff had very minimal degenerative changes. (Id.).

Dr. Suk Won Park, Plaintiff's treating physician, began seeing Plaintiff on December 29, 2004. (AR 269). Dr. Park's notes from December 29, 2004 state that Plaintiff had no job, complained of lower back pain and assessed Plaintiff with an acute lumbosacral strain. (AR 228). X-rays on Plaintiff's spine from that day noted a "minimal old anterior compression fracture . . . involving the L1 vertebra with mild to moderate degenerative change of the L1-2 disc interspace" and reported that the other levels of the lumbar spine show a very mild degree of degenerative changes and no disalignment. (AR 215).

On January 18, 2005, Plaintiff met with Karen Chambers, PA-C, complaining of headaches after a non-contrast CT scan of his head. (AR 193, 201-02). Ms. Chambers physically examined Plaintiff, noting that Plaintiff was alert and was in no acute distress. (AR 201). Ms. Chambers also noted that Plaintiff's back was normal upon inspection and that Plaintiff's head CT images returned normal. (AR 201-02).
//

In a clinic progress record dated January 20, 2005, Dr. Park noted that Plaintiff still complained of back pain. (AR 229). Dr. Park wrote that Plaintiff's lower back pain was likely more secondary to the degenerative joint disease than the minimal compression fracture. (Id.). Dr. Park also noted that Plaintiff's head CT was normal and that Plaintiff was seeking disability benefits. (Id.).

On February 17, 2005, Plaintiff underwent an MRI of the lumbosacral spine. (AR 156). Although "compression fracture" was listed under clinical information, the interpreting doctor did not mention any independent evidence confirming Plaintiff had a compression fracture. (Id.). The interpreting doctor found a "focal left dorsal lateral extrusion of nucleus pulposus" and a "[m]ild peridiscal hypertrophic changes with bulging annulus" at the "L1-L2 level," a "[m]ild broad-based prolapse of nucleus pulposus" and "[v]ery mild disc related spinal stenosis" at "L4-5," "[b]ulging annulus with linear tear in the outer fibers" at "L5-S1," "and "[v]ery mild bilateral lateral recess stenosis from "L4 to S1." (Id.).

On February 22, 2005, Dr. Park noted that Plaintiff had an old compression fracture of L1, and Plaintiff's MRI showed a mild disc bulge and mild degenerative joint disease. (AR 238). Dr. Park wrote in a referral note that even though Plaintiff reported that his current medication did not control his pain, he refused morphine. (Id.). On February 24, 2005, Dr. Park met Plaintiff to follow up on his back pain. (AR 230). Plaintiff still complained of "L1/L2 back pain" and noted that the MRI showed minimal degenerative joint disease. (Id.).
//

On February 25, 2005, Dr. Park wrote a letter diagnosing Plaintiff with a "L1 lumber (sic) compression fracture, with significant pain at that site." (AR 173). Dr. Park stated that the MRI ruled out other pathology despite previously stating that the MRI showed a disc bulge and mild degenerative joint disease. (Id.).

Dr. Park referred Plaintiff to Dr. Joey Gee for Plaintiff's headaches. (AR 204-06). In Dr. Gee's outpatient neurology consultation notes dated April 4, 2005, he stated that Plaintiff's strength was within normal limits and that Plaintiff was alert, oriented, pleasant and cooperative. (AR 205). Dr. Gee also noted that Plaintiff's arm swing and gait were normal. (Id.). Two days later, Plaintiff saw Dr. Robert Allen, who modified Plaintiff's duties and referred Plaintiff to "ortho." (AR 152). According to Dr. Simpkins, Dr. Allen prescribed Plaintiff a back brace that Plaintiff did not find "very helpful." (AR 176, 183).

On June 14, 2005, Dr. Park wrote a letter stating that Plaintiff suffered severe pain that could not be controlled "despite aggressive treatments" and categorized Plaintiff as disabled. (AR 169). On that day, Dr. Park noted that Plaintiff could ambulate despite his back pain and that Plaintiff kept postponing anesthesia. (AR 236). On July 7, 2005, Dr. Gee noted that Plaintiff was in no apparent distress and had a normal gait. (AR 237).

On October 11, 2005, Dr. Eleanor Cho noted that Plaintiff rated his back pain as a five on a scale of one to ten, described his back pain as "somewhat bothersome" while sitting, and stated the pain got worse

when he tried to get up. (AR 240). Dr. Cho also noted that Plaintiff had previously turned down an epidural injection, had received no treatment for his back other than Motrin and stated the pain decreased while standing but would hurt while walking. (Id.). Dr. Cho's notes described Plaintiff in relatively good condition, stating that Plaintiff was alert and cooperative, had no tenderness, had good motor strength in his lower extremities, had intact sensations in both lower extremities and had negative straight leg and Patrick's test. (AR 241).

On April 14, 2006, Dr. Gerald Goodlow reviewed Plaintiff's MRI and examined him. (AR 275-76). Dr. Goodlow stated that the prior MRI showed that "there was bulging of the disc at L1-2, L4-5, and L5-s1." (AR 275). Dr. Goodlow noted that Plaintiff was "otherwise in good health" and that Plaintiff was taking Motrin for his back pain. (Id.). Dr. Goodlow's physical examination revealed pain "mostly located along the right lumbosacral paraspinal muscles and also in the midline," and the pain was "particularly worsened with extension and lateral bending." (Id.). Dr. Goodlow also noted that Plaintiff's strength was five out of five and had an unremarkable gait. (Id.). Dr. Goodlow stated that Plaintiff could have a "possible L1 compression fracture without evidence of radiculopathy." (Id.).

On June 28, 2006, Plaintiff underwent another MRI per Dr. Goodlow's referral. (AR 278-79). The scan revealed a "central disc protrusion at L5-S1 with annular tear," a generalized "posterior disc protrusion at L4-L5 level, affecting the lateral recess where bilateral traversing L5 roots are located," and a "moderate discogenic disease at L1-L2 with a . . . posterior disc protrusion." (Id.). The interpreting doctor

explicitly found that the "lumbar spine is normal from L1 to S1 without compression fracture or spondylolisthesis." (AR 279).

In between Plaintiff's appointments with Dr. Goodlow, Plaintiff met with Dr. Park on February 1, 2006, May 24, 2006 and July 28, 2006. (AR 280-282). On February 1, 2006, Dr. Park wrote that Plaintiff had an outside MRI and stated that a standing forklift was not available at his current job. (AR 280). On May 24, 2006, Dr. Park noted that Plaintiff wanted disability and worker's compensation for the lumbar compression fracture. (AR 281). On July 28, 2006, Dr. Park only wrote "form needs to be filled out." (AR 282). On August 2, 2006, Dr. Park filled out a Residual Functional Capacity Questionnaire where Dr. Park stated that Plaintiff suffered from a compression fracture of the first lumbar vertebrae and diffuse multilevel disc bulges of the lower spine. (AR 269). Dr. Park stated that Plaintiff suffered from insomnia, chronic lower back pain, and severe middle back pain. (Id.). Dr. Park stated Plaintiff could not sit or stand for more than thirty minutes before needing to get up, could only occasionally lift items less than ten pounds, will require unscheduled breaks daily, suffers symptoms that will frequently interfere with Plaintiff's attention and concentration, and has a "poor" prognosis. (AR 269-71).

**2.    Dr. Albert Simpkins**

On October 25, 2005, Plaintiff submitted to an agreed medical evaluation by consulting physician, Dr. Albert Simpkins. (AR 175). Dr. Simpkins, an orthopaedic surgeon certified by the American Board of Orthopaedic Surgery, made findings based on Plaintiff's medical records

9

from May 26, 2004 to July 7, 2005; Plaintiff's history of injury, as related by Plaintiff; a physical examination of Plaintiff; and Plaintiff's June 23, 2005 deposition. (AR 175-88).

Dr. Simpkins reviewed and summarized Plaintiff's medical records, including Dr. Peter Sofia's notes from a June 28, 2005 examination of Plaintiff. (AR 181-82).[1] Dr. Sofia noted that Plaintiff rated his pain a nine out of ten but he had difficulty believing Plaintiff's claim because "[he] was sitting quite comfortably." (AR 181). Dr. Sofia questioned why other doctors declared Plaintiff's alleged injury occupational or why Plaintiff had been scheduled for epidurals without evidence of radiculopathy. (AR 182). Dr. Sofia also stated that the injury did not appear to be work related, that [Plaintiff] has the expected degenerative changes for his age, and that causation appears to be "100% nonwork related to age-related degenerative changes, previous hobbies, lifting of children, etc." (Id.).

Dr. Simpkins wrote in his report that Plaintiff complained of constant aching and burning pain in his lower back that did not radiate to other body parts. (AR 176). Dr. Simpkins also reported that Plaintiff stated that excessive standing and sitting aggravated the pain while reclining and rest alleviated the pain, which was inconsistent with Plaintiff's December 4, 2007 testimony that he experienced pain while laying down. (AR 23, 176). Plaintiff denied participating in

---

[1] The Court notes that Dr. Sofia's original notes are not in the administrative record. However, neither Plaintiff nor the Commissioner has challenged the validity of Dr. Simpkins's summary of Dr. Sofia's notes. Therefore, the Court will treat Dr. Simpkins's summary as a faithful and accurate summary of Dr. Sofia's notes.

regular exercise or recreational activities. (AR 177). When questioned about his daily activities, Plaintiff denied experiencing any pain other than while standing, sitting and walking. (AR 178). Plaintiff also denied pain while sleeping, although stated that he did not feel rested after waking up. (Id.).

Dr. Simpkins noted that Plaintiff's gait was "within normal limits," and Plaintiff could perform a full squat without support. (AR 184). Dr. Simpkins found no evidence of muscle spasms and all sensations were within normal limits. (Id.). Dr. Simpkins stated that Plaintiff's x-rays showed "some mild wedging of L1 and T12 with some spondylosis at that level," and that Plaintiff's disc heights were "otherwise fairly well maintained." (AR 185). Dr. Simpkins opined that Plaintiff's condition was "permanent and stationary" and Plaintiff should be precluded from "sitting for one hour without changing positions as well as repetitive bending, twisting and repetitive very heavy lifting." (AR 185-86). Dr. Simpkins added that "[i]f [Plaintiff] can operate a standing forklift then he is not [a qualified injured worker]." (AR 186).

### 3. Dr. Warren Yu

Dr. Warren Yu, a consulting physician, examined Plaintiff at the Commissioner's request and submitted a summary report dated April 23, 2006. (AR 257-260). Dr. Yu is a board certified orthopedic surgeon. that Dr. Yu reported that Plaintiff underwent no therapy or invasive procedures and received no injections to treat his back. (AR 257). Dr. Yu noted that Plaintiff had a normal gait and did not require an

11

assistive device for ambulation. (AR 258). Dr. Yu reported that Plaintiff's range of motion in all extremities were within normal limits, and Plaintiff's motor strength and sensation in all extremities were grossly within normal limits. (AR 258-59). Dr. Yu also stated that the radiology results revealed normal lordosis, fairly well maintained disk spaces, mild anterior spurring of the lumbar vertebrae, no evidence of fractures or dislocations. (AR 259).

Dr. Yu concluded that the physical examination revealed a moderate myofascial lumbosacral tenderness with moderate guarding, (AR 258), and the radiology results revealed mild spondylosis but were otherwise unremarkable. (AR 259). Dr. Yu stated that "[Plaintiff] should be able to walk without an assistive device. [Plaintiff] should be able to sit, stand or walk for up to six hours in an eight-hour day. He should occasionally be allowed to pick up 50 pounds and frequently 25 pounds." (AR 260).

### 4. Dr. F. Kalmar

Dr. Kalmar, a non-examining consulting physician, filled out a physical residual functional capacity assessment form dated May 24, 2006 after reviewing Plaintiff's medical records. (AR 261-68). Dr. Kalmar opined that Plaintiff should be able to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk with normal breaks for about six hours in an eight hour day and push and/or pull hand and/or foot controls without limitations. (AR 262). Dr. Kalmar assessed Plaintiff to have no postural, manipulative, visual, communicative, or environmental limitations. (AR 263-66).

1    Dr. Kalmar explicitly disagreed with Dr. Yu's conclusions. In

2    particular, Dr. Kalmar stated that Plaintiff most appropriately has a

3    light residual functional capacity and disagreed with Dr. Yu's opinion

4    that Plaintiff could occasionally carry fifty pounds, frequently lift

5    twenty-five pounds, walk for six hours in an eight hour day and sit for

6    six hours in an eight hour day.  (AR 267).  Dr. Kalmar recommended more

7    conservative restrictions and stated that a light residual functional

8    capacity was more appropriate than the limitations suggested by Dr. Yu.

9    (Id.).  Dr. Leonard Naiman, another non-examining consulting physician,

10   evaluated Plaintiff's medical records and Dr. Kalmar's findings at the

11   Commissioner's request.  (AR 292-94).  He agreed with Dr. Kalmar's

12   conclusions after reviewing Plaintiff's medical records but stated that

13   Plaintiff's    postural    limitations    should    be    modified    to

14   "frequently."  (AR 294).

16                                **IV.**

17              **THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

19       To qualify for disability benefits, a claimant must demonstrate a

20   medically determinable physical or mental impairment that prevents him

21   from engaging in substantial gainful activity[2] and that is expected to

22   result in death or to last for a continuous period of at least twelve

23   months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing

24   42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant

25   incapable of performing the work he previously performed and incapable

27        [2]   Substantial gainful activity means work that involves doing
28   significant and productive physical or mental duties and is done for pay
     or profit.  20 C.F.R. §§ 404.1510, 416.910.

of performing any other substantial gainful employment that exists in the national economy. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

(1)   Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

(2)   Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.

(3)   Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, the claimant is found disabled. If not, proceed to step four.

(4)   Is the claimant capable of performing his past work? If so, the claimant is found not disabled. If not, proceed to step five.

(5)   Is the claimant able to do any other work? If not, the claimant is found disabled. If so, the claimant is found not disabled.

<u>Tackett</u>, 180 F.3d at 1098-99; <u>see also</u> <u>Bustamante v. Massanari</u>, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing <u>Tackett</u>, 180 F.3d at 1098); 20 C.F.R. §§ 404.1520(b)- 404.1520(g)(1) & 416.920(b)-416.920(g)(1).

//

14

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54 (citing Tackett, 180 F.3d at 1098). Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry. Id. at 954 (citing Tackett, 180 F.3d at 1098 n.3). If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"),[3] age, education, and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1100-01). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

//

//

//

//

---

[3]     Residual functional capacity is "what [one] can still do despite [his] limitations" and represents an "assessment based upon all of the relevant evidence." 20 C.F.R. §§ 404.1545(a), 416.945(a).

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process discussed above. (AR 45-53). At the first step, the ALJ indicated that Plaintiff had not engaged in substantial gainful activity since January 18, 2005. (AR 46). At the second step, the ALJ found that Plaintiff suffered from the following severe impairments: a compression fracture and degenerative disc disease. (Id.). The ALJ concluded that Plaintiff's headaches were not "severe" because the headaches were controlled by medication and did not cause any functional limitations, noting that Plaintiff reported only having two headache days a month after starting treatment. (AR 46-47). At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meet or medically equal any of the impairments appearing in the "Listing of Impairments" set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 47).

Before proceeding to step four, the ALJ determined that Plaintiff had the residual functional capacity to perform sedentary work. (Id.). The ALJ determined that Plaintiff had the following limitations:

"[T]he [Plaintiff] can occasionally lift and/or carry 10 pounds and frequently lift and/or carry 10 pounds; push and pull within weight limits noted herein; he can stand and/or walk two hours out of an eight-hour work day and sit for six hours; he cannot work at unprotected heights; he is limited to occasional climbing, balancing, stooping, kneeling,

16

crouching and crawling; and he is limited to occasional lifting above shoulder level."

(Id.). Although the ALJ found that Plaintiff did have impairments that could produce Plaintiff's symptoms, the ALJ rejected Plaintiff's testimony regarding the severity of his symptoms. (AR 49). The ALJ found that Plaintiff was not credible regarding the severity of his symptoms because of inconsistent records, a record of conservative treatment and the absence of diagnostic results that support the degree of pain alleged. (Id.).

After determining Plaintiff's residual functional capacity, the ALJ determined that Plaintiff would be unable to perform his past relevant work. (AR 51). At step five, the ALJ relied on vocational expert ("VE") testimony to determine that significant numbers of jobs existed for a 37 year old male with limited education and the physical restrictions state above. (AR 52). Therefore, the ALJ found that Plaintiff was not disabled as defined in the Social Security Act. (AR 53).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing

17

Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)). "Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279). To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (citing Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

## VII.

### DISCUSSION

Plaintiff argues that remand is necessary because the ALJ (1) did not offer clear and convincing evidence to reject Plaintiff's credibility; (2) did not properly consider the treating physician's opinion; and (3) did not meet his burden of proof at step five to show Plaintiff is capable of performing other work. (Plaintiff's Memorandum

18

at 2-10).  The Court disagrees with all of Plaintiff's contentions, as discussed below.[4]

## A.     **The ALJ Provided Clear And Convincing Reasons For Rejecting Plaintiff's Credibility**

Plaintiff argues that the ALJ improperly rejected Plaintiff's testimony.  (Plaintiff's Memorandum at 7-10).  Specifically, Plaintiff argues that Plaintiff's soccer activity and Plaintiff failing to use the prescribed back brace does not support the ALJ's determination that Plaintiff lacked credibility.  (Plaintiff's Memorandum at 9).  Plaintiff also argues that Dr. Park's opinions support Plaintiff's claims and were consistent with his functional limitations.  (Id.).  The Court disagrees.  The ALJ rejected Plaintiff's testimony with clear and convincing reasons supported by substantial evidence in the record.

The ALJ may reject a plaintiff's testimony if he or she makes an explicit credibility finding that is "supported by a specific, cogent reason for the disbelief." Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (internal citations omitted).  Unless there is affirmative evidence showing that the plaintiff is malingering, the ALJ's reasons for rejecting the plaintiff's testimony must be "clear and convincing." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  Moreover, the ALJ may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence.  Bunnell v. Sullivan, 947

---

[4]   The Court will address Plaintiff's contentions in a different order than argued in Plaintiff's Memorandum.

19

F.2d 341, 346-47 (9th Cir. 1991). An ALJ may rely on evidence such as "prior inconsistent statements," "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment" or "the claimant's daily activities" to make a credibility determination. Smolen, 80 F.3d at 1284. The ALJ must make specific findings to allow the court to conclude that "the ALJ did not arbitrarily discredit claimant's testimony." Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1224 n.3 (9th Cir. 2010) (quoting Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002).

In the ALJ's decision, the ALJ states that Plaintiff reported he took only over-the-counter pain medication, did not obtain physical therapy and received only one epidural injection for his back. (AR 48). The ALJ also observed that Plaintiff made inconsistent statements regarding his activities and level of pain. (AR 49). Furthermore, the ALJ noted that the doctors that examined Plaintiff made observations inconsistent with the alleged severity of Plaintiff's symptoms. (Id.). The ALJ states the following reasons for rejecting Plaintiff's testimony:

> "After considering the evidence of record, the [ALJ] finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible. The [Plaintiff] is not consistent in the record with the reported severity of pain. In addition, the claimant only takes over the counter pain medications and

does not use the prescribed back brace and did not want any epidural injections after receiving only one.  The clinical and diagnostic test results do not support the degree of pain alleged by the claimant."

(Id.).  Here, the ALJ provided three clear and convincing reasons for rejecting Plaintiff's pain testimony.  (Id.).

First, the ALJ found that Plaintiff was not consistent in the record regarding his pain.  (Id.).  An ALJ may rely on a claimant's inconsistent statements, inconsistent observations made my doctors, and the claimant's daily activities to reject the claimant's credibility. See Turner, 613 F.3d at 1224-25.  The ALJ pointed to Dr. Sofia's observation from June 25, 2005 that "[Plaintiff's] allegations of pain of nine on a scale of one to ten was 'difficult to believe'" because "despite [Plaintiff's] pain allegations of nine on a scale of one to ten 'the patient was sitting quite comfortably.'"  (AR 49) (citing AR 181-82).  Additionally, the ALJ noted Plaintiff's inconsistent complaints during a May 25, 2004 emergency room visit where the Plaintiff initially complained of headaches but then denied headaches and only reported back pain.  (AR 49, 159).  The ALJ also found that Plaintiff may have been more active than alleged, stating that in July 2004 Plaintiff reported "regularly play[ing] soccer" and that in June 2005 Plaintiff reported that he had "been a soccer player up until recently for many years. . . ." (AR 49) (citing AR 159, 182).  The ALJ provided multiple inconsistencies that support his conclusion that Plaintiff lacked credibility regarding the severity of his pain.
//

21

Plaintiff argues that the soccer evidence should not impeach his credibility because the evidence is not entirely inconsistent with the alleged January 18, 2005 onset of disability. (Plaintiff's Memorandum at 9). The Commissioner does concede that the soccer evidence is not necessarily inconsistent with the alleged onset of disability. (Commissioner's Memorandum at 3). However, Plaintiff's argument is without merit because this Court will defer to the ALJ's judgment when interpreting ambiguous evidence. <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1042-43 (9th Cir. 2007). Because the soccer evidence is ambiguous regarding when Plaintiff stopped playing, the Court cannot overturn the ALJ's decision. Furthermore, Plaintiff fails to address the other inconsistent statements cited by the ALJ. Even if this Court ignored the soccer evidence, the ALJ provided other inconsistencies to reject Plaintiff's pain testimony and his conclusion is supported by substantial evidence in the record.

Examples of other inconsistent statements include Plaintiff's statements to doctors Simpkins and Cho. While being examined by Dr. Simpkins, Plaintiff stated that "[r]eclining and resting alleviate pain" and denied pain while sleeping despite testifying that laying down caused pain to the point where he could not sleep well and had to sleep in "almost [a] standing position with cushions around." (AR 23, 176, 178). During an October 11, 2005 visit to Dr. Cho, Plaintiff rated his pain as a five on a scale of one to ten and described it as "somewhat bothersome" while sitting as opposed to Plaintiff testifying the pain was a nine out of a scale of one to ten and describing the pain as an "intense pain that is inside." (AR 211).

//

Additionally, the ALJ provided a clear and convincing reason to reject Plaintiff's pain testimony by finding that Plaintiff only sought conservative and limited treatment. See Smolen, 80 F.3d at 1284. The ALJ states that Plaintiff "had not had any physical therapy and only one injection," and that Plaintiff only reported taking "over the counter pain medications three times a day, Ibuprofen and Motrin." (AR 48). Plaintiff's testimony from December 4, 2007 and Dr. Cho's October 11, 2005 notes confirm the ALJ's finding. (AR 21, 211). Plaintiff testified that he "never really had therapies," primarily took Motrin, and only received one epidural injection. (AR 21). Dr. Cho states that Plaintiff delayed obtaining an epidural injection. (AR 211). Furthermore, Plaintiff did not wear the back brace prescribed by Dr. Robert Allen in April 2005. (AR 176). Although Plaintiff argues that the back brace was not helpful, (Plaintiff's Memorandum at 9) (citing AR 183), Plaintiff's argument does not address why he did not pursue more aggressive treatments beyond over-the-counter medications, why he turned down the epidural injection initially, or why he did not undergo physical therapy. Therefore, Plaintiff's conservative treatment provided the ALJ with a sufficient reason to reject Plaintiff's pain testimony. See Smolen, 80 F.3d at 1284.

Furthermore, the ALJ found that the diagnostic results did not support Plaintiff's claims. (AR 49). The ALJ stated that most of Plaintiff's physical examination results were similar, and used the October 11, 2005 notes from Dr. Cho as an example of the general findings. (Id.). The ALJ points out that Plaintiff only had a slightly decreased range of motion with mild pain reported with extension. (AR 241, 258, 275). Motor strength was generally rated five out of five to

both lower extremities or within normal limits. (AR 184, 241, 259, 275). Plaintiff's sensations were intact to both lower extremities. (AR 184, 241). Straight leg and Patrick's tests were generally negative. (AR 184, 241, 258, 275; <u>but see</u> AR 182 (Dr. Sofia notes that Plaintiff's "straight-leg raising was negative" but did report that Plaintiff had "back pain on straight-leg raising.")).

Other observations and diagnostic results in the record support the ALJ's conclusion. A June 14, 2004 follow up states that Plaintiff's spine reveled no deformities, misalignment or mass; revealed no tenderness to palpation; and had a normal range of motion in all directions. (AR 162). On October 25, 2005, Dr. Simpkins observed that Plaintiff's gait "was within normal limits" and that "[Plaintiff] is able to perform a full squat without support." (AR 184). During an April 26, 2006 examination, Dr. Yu reported that Plaintiff's had a normal gait, did not require an assistive device to ambulate, and had normal swing and stance phases. (AR 258). These observations and diagnostic results are inconsistent with Plaintiff's claim that his pain limited his capabilities to the point where he needed assistance every day for self-care. (AR 27). Therefore, substantial evidence in the record supports the ALJ's conclusion that Plaintiff lacked credibility regarding the severity of his pain.

**B.** **The ALJ Provided Specific And Legitimate Reasons To Reject The Treating Physician's Opinion**

Plaintiff argues that the ALJ failed to properly consider the opinions of Dr. Park, Plaintiff's treating physician. (Plaintiff's

24

Memorandum at 2). Plaintiff argues that the ALJ had a duty to recontact Dr. Park to clarify the basis of Dr. Park's opinion, (Plaintiff's Memorandum at 4), the ALJ did not set forth substantial evidence to support the ALJ's finding that Dr. Park's opinion was based solely on Plaintiff's subjective complaints, (Plaintiff's Memorandum at 4), and that the December 29, 2004 x-ray that revealed an old compression fracture and the June 28, 2006 MRI support Dr. Park's opinion. (Plaintiff's Memorandum at 5). The Court disagrees. The ALJ provided specific and legitimate reasons for giving Dr. Park's opinions little weight and had no duty to recontact Dr. Park.

Although the treating physician's opinion is entitled to great deference, it is "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999). "When there is conflicting medical evidence, the [Commissioner] must determine credibility and resolve the conflict." Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992). The ALJ may reject a treating physician's opinion in favor of a conflicting opinion of an examining physician if the ALJ makes findings setting forth specific and legitimate reasons for doing so that are based on substantial evidence in the record. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). In addition, the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings. See Matney, 981 F.2d at 1019.

//

//

25

Where the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those for the treating physician, the opinion of the nontreating source may itself be substantial evidence. <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995). "It is then solely the province of the ALJ to resolve the conflict." <u>Id.</u>

The ALJ summarizes the medical evidence then states the following:

"As for the opinion evidence, I have read and considered the opinion of disability on behalf of the claimant from Dr. Suk Park in his letter dated June 14, 2005 and his functional report dated August 2, 2006. I find that these statements are not supported by the objective medical evidence, including Dr. Suk Park's own clinical and diagnostic findings.

Dr. Suk Park's statement of disability is based solely on the claimant's subjective complaints of pain. It was not until the claimant requested a letter of disability did the tone of the treatment notes and reports change. Initially, Dr. Suk Park stated that the claimant's pain was most likely from the 'minimal compression fracture'. In fact he initially reported the headaches as being the more severe condition. It appears that the statements of disability were based on patient accommodation and not on the actual clinical and diagnostic findings. Therefore, I find that the opinions

26

1    of Dr. Suk Park are given little weight."

3    (AR 50) (internal citations omitted).

5    Here, the ALJ specifically found that objective medical evidence
6    did not support Dr. Park's opinion. (AR 50). The ALJ's conclusion is
7    bolstered by ample evidence in the record consistent with the ALJ's
8    finding. As previously mentioned, the ALJ states that the general
9    diagnostic results show Plaintiff did not suffer from the degree of pain
10   as alleged. (AR 49; see supra p. 23-24). The ALJ also notes that Dr.
11   Park's conclusions contradict the opinions of Dr. Simpkins. (AR 50-51).
12   Dr. Simpkins based his opinions on an independent examination and a
13   review of Plaintiff's medical records. (AR 174-88). The ALJ found that
14   Dr. Simpkins's clinical findings and diagnostic conclusions were
15   "consistent with the medical record as a whole and not inconsistent with
16   the opinions of the [Commissioner] or the consultative examiner who all
17   agree that [Plaintiff] is not disabled" and gave Dr. Simpkins' opinions
18   "great weight." (AR 50-51) (internal citations omitted). The ALJ found
19   that Plaintiff could walk normally and could perform a full squat
20   without assistance during Dr. Simpkins's examination of Plaintiff. (AR
21   51, 184). These observations are inconsistent with Dr. Park's opinion
22   that Plaintiff is disabled. (AR 269-73). Dr. Simpkins concluded that
23   Plaintiff is not as limited as Dr. Park suggests, and his opinion is
24   consistent with the opinions of Dr. Yu, Dr. Sofia, Dr. Kalmar and Dr.
25   Naiman. (AR 174-88, 257-73, 294).
26   \\
27   \\
28   \\

The radiology results also support the ALJ's finding that Dr. Park's conclusions are not supported by the objective medical evidence. Dr. Park states that he based his opinions on the x-ray and MRI of the spine that confirm Plaintiff's L1 compression fracture. (AR 269). However, in x-rays interpreted by Dr. Sofia on June 28, 2005 showed no evidence of spondylosis, spondylolisthesis, a compression fracture, scoliosis or facet arthritis. (AR 179). In a report dated April 23, 2006, Dr. Yu stated that Plaintiff's radiology images contained "no evidence of fractures or dislocations." (AR 259). Additionally, the June 28, 2006 MRI findings state that the "alignment of the lumbar spine is normal from L1 through S1 without compression fracture. . . ." (AR 279) (emphasis added). No radiograph has stated that Plaintiff's compression fracture identified in the December 29, 2004 x-rays had become worse or caused complications to explain his persisting symptoms. (See, e.g., AR 179, 191, 215, 259, 279). In fact, other than the December 29, 2004 x-ray, no other doctor has independently identified evidence of or confirmed a compression fracture. (See, e.g., AR 179, 191, 215, 259, 279). At most, other doctors have stated that a compression fracture is merely possible. (e.g., AR 212, 275). The inadequate support for Dr. Park's findings provided the ALJ with a specific and legitimate reason supported by the record to reject Dr. Park's opinion. See Matney, 981 F.2d at 1019.

The ALJ also concluded that Dr. Park's own clinical findings do not support Dr. Park's opinions in his letters from February 25, 2005 and June 14, 2005, and in his August 2, 2006 functional report. (AR 50). Dr. Park's February 25, 2005 letter states that Plaintiff suffers significant pain from a "L1 lumber (sic) compression fracture." (AR

28

173). However, the ALJ found that Dr. Park originally noted that Plaintiff's headaches were the more severe condition. (AR 229). Initially, Dr. Park stated that Plaintiff had an acute lumbosacral strain. (AR 228). After the December 29, 2004 x-ray results, Dr. Park noted that Plaintiff's pain was likely secondary to degenerative joint disease rather than the compression fracture. (AR 229). Dr. Park wrote in a June 14, 2005 letter that Plaintiff was disabled because of severe pain in his back, (AR 169), and stated in an August 2, 2006 residual functional capacity questionnaire that Plaintiff had many physical limitations. (AR 269-273). However, Dr. Park's residual functional capacity questionnaire found Plaintiff did not need an assistive device to walk and did not list a reduced range of motion, a positive straight leg raising test or abnormal gait. (AR 270-71). These clinical findings are not consistent with Dr. Park's opinion that Plaintiff is disabled. Therefore, the ALJ provided a specific and legitimate reason to reject Dr. Park's opinions. See Matney, 981 F.2d at 1019.

Additionally, Dr. Park relied heavily on Plaintiff's discredited subjective complaints of pain, providing the ALJ with a specific and legitimate reason to reject Dr. Park's opinions. See Bray v. Comm'r of Soc. Sec. Admin, 554 F.3d 1219, 1228 (9th Cir. 2009) ("As the ALJ determined that [a plaintiff's] description of her limitations was not entirely credible, it is reasonable to discount a physician's prescription that was based on those less than credible statements."). Dr. Park did report that he reviewed Plaintiff's x-ray and MRI images

in addition to Plaintiff's subjective complaints.[5] (AR 269). However, Dr. Park's letters support the ALJ's conclusion that his opinions relied heavily on Plaintiff's subjective complaints. In Dr. Park's February 25, 2005 letter, he states that he referred Plaintiff to Pain Management because Plaintiff kept reporting pain. (AR 173). In the June 14, 2005 letter, Dr. Park explicitly states that Plaintiff is disabled due to his pain. (AR 169). Furthermore, the ALJ noted that "the tone of the treatment notes and reports change" after Plaintiff reported to Dr. Park that he was seeking disability. (AR 50). Initially, Dr. Park did not believe the compression fracture was significant, stating that Plaintiff's pain was likely secondary to degenerative joint disease rather than the minimal compression fracture. (AR 229). After Plaintiff continued to report severe pain, Dr. Park placed more significance on the x-ray and MRI results. (AR 169, 173, 236). Moreover, Dr. Park did not rely on any other diagnostic tests or observations, such as a positive Patrick's test or straight leg test. (AR 270). Thus, the ALJ correctly found that Dr. Park's opinion rested heavily on Plaintiff's self-reported evidence of pain, not diagnostic tests.

Furthermore, the ALJ found Dr. Park's opinions lacked credibility because "the statements of disability were based on patient accommodation and not on the actual clinical and diagnostic findings." (AR 50). On December 29, 2004, Dr. Park noted that Plaintiff was unemployed. (AR 228) (writing in the left margin "Ø JOB"). On January

---

[5] The Court notes that subsequent radiology images do not report the presence of a compression fracture. (e.g., AR 279).

20, 2005, Dr. Park initially reported Plaintiff's headaches as the more severe condition and noted Plaintiff wanted disability. (AR 229). On February 24, 2005, Dr. Park still viewed Plaintiff's headaches as the more severe condition and noted that the MRI showed minimal degenerative joint disease rather than a compression fracture. (AR 230). Dr. Park did not consider the compression fracture to be remarkable until after Plaintiff requested disability. (AR 228-230, 236). Furthermore, Dr. Park's notes from May 24, 2006 and July 28, 2006 clearly focus on Plaintiff's application for disability. (AR 281-82). After Dr. Park filled out Plaintiff's residual functional capacity questionnaire, Dr. Park makes no note of Plaintiff's back pain. (AR 283). The record supports the ALJ's finding that Dr. Park's opinions shifted after Plaintiff requested disability and that Dr. Park was advocating for Plaintiff. (See AR 228-230, 236, 245, 269-273, 281-83).

Generally, an ALJ may not reject the opinions of a treating doctor merely because the treating doctor assists a patient in obtaining social security benefits. Lester, 81 F.3d at 832. However, an ALJ may use evidence of "actual improprieties" to determine a treating physician's credibility. Id.; Saelee v. Chater, 94 F.3d 520, 523 (9th Cir. 1996). Here, the ALJ found "actual improprieties" in Dr. Park's opinion. The ALJ properly found that Dr. Park changed his opinion to improve Plaintiff's candidacy for benefits, found that Dr. Park lacked clinical findings to support his conclusion, and found that Dr. Park relied heavily on Plaintiff's discredited subjective complaints. Therefore, the ALJ found that Dr. Park was not credible and provided a specific and legitimate reason to reject Dr. Park's opinion. See Saelee, 94 F.3d at 523 ("[T]he ALJ's conclusion that [the treating physician's] solicited

31

report was untrustworthy was a permissible credibility determination. The ALJ stated that [the treating physician]'s opinion 'is worded in such a way that it strikes him as an effort by the physician to assist a patient even though there is no objective medical basis for the opinion.'").

Plaintiff's argument that the ALJ had a duty to recontact Dr. Park is also without merit. An ALJ does not need to obtain more information if the basis for a medical opinion is not ambiguous and the record before the ALJ is substantially complete. <u>McLeod v. Astrue</u>, 640 F.3d 881, 884-85 (9th Cir. 2011). Here, substantially all of Plaintiff's records were in the administrative record, (AR 150-292), and the records demonstrate that Dr. Park explicitly stated that he based his opinion on Plaintiff's x-ray images, MRIs and complaints. (AR 169, 173, 269-73). Furthermore, the record allowed the ALJ to properly conclude that Dr. Park relied heavily on Plaintiff's subjective complaints and attempted to accommodate Plaintiff. (<u>See</u> supra, pp 29-31). Because the record was substantially complete and did not contain any ambiguities regarding Dr. Park's opinions, the ALJ could adjudicate Plaintiff's claim and did not have a duty to contact Dr. Park. <u>See</u> <u>McLeod</u>, 640 F.3d at 885.

**C.    The ALJ Properly Found That Plaintiff Is Capable Of Performing Other Work**

Plaintiff argues that the ALJ erred by finding Plaintiff was capable of performing other work at step five. (Plaintiff's Memorandum at 5). Plaintiff contends that the ALJ erred by relying on vocational

32

expert ("VE") testimony that deviated from the Dictionary of Occupational Titles ("DOT") to determine Plaintiff is capable of performing jobs under the category of "production inspectors" and "sorters and graders." (Plaintiff's Memorandum at 6). The Court disagrees.

The ALJ relied upon VE testimony to determine whether Plaintiff was disabled or not. (AR 52). During the Hearing, the ALJ proposed the following hypothetical to the VE:

> "Assume a hypothetical individual [Plaintiff's] age, education, prior work experience. Assume this person could lift or carry 10 pounds frequently or 10 pounds occasionally, could stand and walk six out of an eight-hour day, can sit two out of an eight-hour day, two hours out of an eight-hour day, no pushing or pulling with the legs, no work on unprotected heights, occasional climbing, no balancing, occasional stooping, kneeling, crouching and crawling, occasional lifting above shoulder level."

(AR 31-32). In his opinion, the ALJ stated the following:

> "Pursuant to SSR 00-4p, the [VE's] testimony is consistent with the information contained in the [DOT].

> Based on the testimony of the [VE], the [ALJ] concludes that, considering [Plaintiff's] age, education, work experience, and residual functional capacity, [Plaintiff] has been

capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of 'not disabled' is therefore appropriate under the framework fo the above cited rule."

(AR 52-53).

Social Security Ruling 96-8p defines a claimant's residual functional capacity as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." The term "regular and continuing basis" is further defined as meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." Id. "In determining residual functional capacity, the ALJ must consider subjective symptoms such as fatigue and pain." Smolen, 80 F.3d at 1291.

Social Security Ruling 00-4p states that the DOT "lists maximum requirements of occupations," and that "[a] VE, VS or other reliable source of occupational information may be able to provide more specific information." 2000 WL 1898704 at *3. Therefore, the DOT creates a presumption of a job's classification but can be rebutted by expert testimony supported by "persuasive evidence in the record." Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995). When there is a conflict, the ALJ must provide a basis for relying on VE testimony over the DOT definitions. Tommasetti v. Astrue, 533 F.3d 1035, 1042 (9th Cir. 2008).

Plaintiff primarily relies on Light v. Soc. Sec. Admin., 119 F.3d 789 (9th Cir. 1997), and Pinto v. Massanari, 249 F.3d 840 (9th Cir.

34

2001), to support his arguments. However, Plaintiff's reliance on <u>Light</u> and <u>Pinto</u> are misplaced. In both <u>Light</u> and <u>Pinto</u>, neither the ALJ nor the VE provided a sufficient explanation for deviating from DOT definitions and concluding a petitioner could work positions that were inconsistent with that petitioner's documented limitations. <u>Light</u>, 119 F.3d at 793; <u>Pinto</u>, 249 F.3d at 846. However, these cases are not applicable because the ALJ here determined that the VE testimony did not conflict with the DOT descriptions as discussed below. Even if the VE testimony did conflict with the DOT descriptions, persuasive evidence in the record supported the VE's deviation.

Here, the ALJ explicitly found that there was no deviation from DOT descriptions. (AR 52). The VE clearly identified why Plaintiff could work as a production inspector, a grader or a sorter. (AR 32-34). During her testimony, the VE stated that "light" bench assembly positions are highly variable because the DOT can classify jobs as "light" due to repetitive lifting of five to eight pounds or could be well over a ten pound lift. (AR 33). The VE explained that she avoided positions that typically sit and that inspection positions allow for more standing. (AR 34). These statements show that the VE considered the specific limitations of Plaintiff and the specific DOT descriptions of these jobs rather than the general description of the category when identifying what jobs Plaintiff could work. Because the evidence supports a finding that the VE accounted for the specific limitations of Plaintiff and the specific requirements of these positions, the record supports the ALJ's conclusion that the VE descriptions did not conflict with the DOT descriptions. (AR 52).

35

Plaintiff's argument is also without merit because even if there was a conflict and the ALJ failed to ask the VE regarding whether or not the VE descriptions conflicted with the DOT descriptions, the error was harmless. <u>Massachi v. Astrue</u>, 486 F.3d 1149, 1154 n.19 (9th Cir. 2007). An ALJ's failure to ask a VE regarding any conflict between the VE's descriptions and DOT descriptions is not reversible error if there was no conflict or the VE "provided sufficient support for her conclusion so as to justify any potential conflicts." <u>Id.</u> Here, the VE supplied ample rationale during her testimony to justify any conflicts.

Plaintiff argues that productions inspector jobs are classified as light work and "require lifting 20 pounds occasionally and 10 pounds frequently." (Plaintiff's Memorandum at 5). Assuming that Plaintiff's assertion is correct, the ALJ explicitly stated to the VE to "[a]ssume that this person could carry 10 pounds frequently or 10 pounds occasionally." (AR 31-32). The VE later explained that the DOT may classify jobs as "light" because the position involves repetitive lifting of five to eight pounds. (AR 33). The VE continued that she avoided small assembly positions because "one typically does sit" and clarified that inspection positions allow for more standing. (AR 34). The VE stated sufficient support to justify any conflict. Plaintiff also contends the "graders and sorters" category is too broad because it includes jobs classified as light and medium work. (Plaintiff's Memorandum at 6). However, Plaintiff's argument is without merit because the VE explicitly restricted the category to "graders and sorters at the sedentary, unskilled level." (AR 34). Therefore, even if the ALJ failed to ask regarding any conflicts between the VE and DOT descriptions of these jobs, the error was harmless because sufficient

evidence in the record supported the VE's deviation.  See Pinto, 249

F.3d at 846; Tommasetti, 533 F.3d at 1042.

## VIII.

### CONCLUSION

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: July 15, 2011.


_____/S/_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE